UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EBONY ROSE SHERMAN,

    Plaintiff,

v.                                            Case No. 2:05-CV-73361

MICHIGAN TUBE SWAGER
FABRICATION, INC., a
Michigan Corporation,

    Defendant,
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pending before the court is Defendant's "Motion for Summary Judgment." Having reviewed the briefs, the court concludes that a hearing on the motion is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will grant Defendant's motion.

**I. BACKGROUND**

Defendant Michigan Tube Swager Fabrication, Inc. ("MTS"), a manufacturer of tables, bases, chairs and bar stools, is located in Temperance, Michigan. (Kulish Dep. at 6-7.)[1] MTS employs approximately 360 employees and has been in business since 1955. (*Id.* at 6, 8.)

Plaintiff Ebony Rose Sherman, an African American female, was an employee of the Defendant from April 1999 until her termination on November 13, 2003. (Pl.'s Dep. at 7, 31.) Plaintiff commenced her employment as a Customer Satisfaction Coordinator. (Def.'s Ex. 3, April 1999 Employee Change of Status Report.) After receiving

---

[1] Mr. Barton Kulish is the Vice President/General Manager for MTS. (Kulish Dep. at 4.)

satisfactory marks in company evaluations (Pl.'s Ex. 2, Sales/Customer Satisfaction Introductory Report), Plaintiff was promoted to the position of Production Planner. (Def.'s Ex. 4, May 2000 Employee Change of Status Report).

In July 2000, Plaintiff was involved in a verbal confrontation in the workplace with co-worker Jackie Lampros, a Caucasian female, which resulted in a company investigation. (Def.'s Ex. 5, Record of a Report on Inappropriate Conduct; Pl.'s Dep. at 37-39.) Plaintiff alleges that Lampros said to her "You're going to get yours you fucking bitch," (*id.*), while Lampros claims that she stated "You'll get yours someday." (Def.'s Mot. at Ex. 5, Record of a Report on Inappropriate Conduct.) In her deposition, Plaintiff testified that she did not use profanity in her encounter with Lampros. (Pl.'s Dep. at 38.) Both women were issued verbal warnings. (Def.'s Ex. 5, Record of a Report on Inappropriate Conduct; Sherman Dep. at 38-39.) After the incident, Plaintiff's August 2001 evaluation by Supervisor Cynthia Hensley reflected a "G" (good) score for Interpersonal Relationships. (Pl.'s Ex. 9, Evaluation; Hensley Dep. at 12-13.) In January 2002 Plaintiff's salary was increased to $590.00 per week. (Def.'s Ex. 18, January 2002 Employee Change of Status Report.)

In December 2002 Plaintiff complained to management about the promotion of a fellow employee, Leroy LePlante, a Caucasian male. (Pl.'s Ex. 12, December 9, 2002 Letter from Ebony Sherman to Bart Kulish.) Plaintiff, who had been working for Defendant's company for three and a half years and had no supervisory experience, felt she had been discriminated against on the basis of her race and sex. (*Id.*) Management replied that LePlante had "over ten (10) years of direct supervisory experience, as well as an aggregate of over twenty-one (21) years of experience with

MTS in a variety of positions and departments, and an intimate knowledge of [the] product line." (Def.'s Ex. 13, December 16, 2002 Letter from Bart Kulish.) LePlante's education and aggregate work experience were listed as "instrumental factors" in Defendant's selection process. (*Id.*)

In January 2003 Plaintiff used "the F word" during a discussion with Manager Kurt Thayer. (Def.'s Ex. 19, Record of Occurrence by Thayer; Def.'s Ex. 20, Record of Occurrence by Kelly Peitz, Inventory Coordinator; Def.'s Ex. 21, Record of Occurrence by Rob D'Arpini.) Mr. Thayer warned Plaintiff about her use of the word, to which Plaintiff responded that she could use such language in light of her First Amendment Rights. (*Id.*)

In February 2003 Plaintiff was observed sleeping at her desk by her supervisor, Cindy Hensley; Plaintiff indicated she was on medication that made her drowsy. (Pl.'s Dep. at 47-48.) Plaintiff was directed to provide Human Resources with proper documentation of her specific medial restrictions, but failed to do so. (*Id.*; Def.'s Ex. 22, Letter from Laura Lange, Employee Services Supervisor.)

On April 24, 2003, Plaintiff was involved in an altercation with co-worker Leslie Setlock during which Plaintiff allegedly refused, in an aggressive manner, to take a document from Ms. Setlock. (Def.'s Ex. 23, April 30, 2003 Letter from Leslie Setlock); Def.'s Ex. 24, April 30, 2003 Letter from Melissa Love.) At the end of their exchange, Plaintiff claimed to be "kidding." (*Id.*) The letters relating to the incident were added to Plaintiff's personnel file. In May 2003, Defendant approved Plaintiff's request for financial assistance in pursuing a Masters Degree in Business Administration at the

3

University of Toledo. (Def.'s Ex. 28, May 15, 2003 Letter from Phil Swy, President, MTS, to Ebony Sherman.)

On April 24, 2003, the Equal Employment Opportunity Commission ("EEOC") issued Defendant notice of Plaintiff's second discrimination charge with the Michigan Department of Civil Rights. (Pl.'s Ex. 16, Notice of Charge of Discrimination.)[2]

In November 2003, Defendant instituted a system that required Cindy Hensley to sign off on "change order[s]" prior to Jon Fritz, Shipping Manager, approving the changes. (Pl.'s Dep. at 51-52.) On the morning of November 12, 2003, Plaintiff attempted to contact Mr. Fritz in order to obtain his signature on some change orders, paging him eight to ten times over the course of approximately forty-five minutes. (*Id.* 48-62, Def.'s Mot. at Exs. 6-10.) Upon speaking with her live over the telephone, Mr. Fritz informed Plaintiff that he had a regularly scheduled meeting which prevented him from responding to Plaintiff's pages.[3] (*Id.*) During the course of this conversation, Plaintiff abruptly hung up the telephone. (*Id.*) Mr. Fritz telephoned Plaintiff back and asked whether she had dropped the phone. (*Id.*) While Plaintiff claims he said "sweetie, surely, surely you must have dropped the phone sweetie, hon," (Sherman Dep. at 51), Fritz claims he asked if she had dropped the phone and she said no, she had hung up on him. (Def.'s Ex. 7, Record of Occurrence by Fritz). )

Fritz then came to Plaintiff's cubicle. (*Id.*) Plaintiff claims Fritz stood extremely close to her and she repeatedly asked him to leave. (Pl.'s Dep. at 51-52.) Fritz asserts he informed Plaintiff he could not sign the forms because they were missing another

---

[2] Plaintiff filed her first charge of discrimination with the Michigan Department of Civil Rights complaining of discrimination in November 2001.

[3] Plaintiff claims that Mr. Fritz made condescending remarks about her intelligence during the phonecall. (Pl.'s Dep. at 50-51.)

4

signature and that Plaintiff became hostile, using the "F" word and other offensive language.  (Def.'s Ex. 7, Record of Occurrence by Fritz.)  Employee Marion Rapp, a witness to the incident, corroborates Fritz's account and indicated that Plaintiff was verbally abusive to Fritz.  (Def.'s Ex. 8, Memo to File by Rapp.)

Following an investigation, including interviews of all involved parties and witnesses, Human Resources Director Laura Lange concluded that Plaintiff's conduct warranted immediate termination.  (Lange Dep. at 88-93.)  Plaintiff's employment was terminated on November 13, 2003 for "Gross Misconduct" and "involvement in an altercation with a fellow employee."  (Pl.'s Ex. 26, Letter from Laura Lange to Ebony Sherman; Lange Dep. at 95-96.)  In her letter, Lange indicated that "this was not the first verbal altercation in which [Plaintiff] was involved and warned as being unacceptable behavior."  (Pl.'s Ex. 26, Letter from Laura Lange to Ebony Sherman.)

During the course of her employment, Plaintiff voiced numerous concerns regarding a perceived "hostile environment" and alleged race and sex discrimination in the handling of incidents, compensation and advancement opportunities.  (*See* Pl.'s Ex. 5, August 14, 2000 Letter from Ebony Sherman to Bart Kulish; Pl.'s Ex. 12, December 9, 2002 Letter from Ebony Sherman to Bart Kulish; Pl.'s Ex. 14, E-mail from Ebony Sherman to Bart Kulish (January 21, 2003, 2:59 p.m.); Pl.'s Ex. 17, E-mail from Ebony Sherman to Cindy Hensley, Customer Satisfaction Manager, Michigan Tube Swager Fabrication, Inc. (May 29, 2003, 12:15 p.m.); Pl.'s Ex. 25, E-mail from Ebony Sherman to Burt Kulish (November 13, 2003, 10:15 a.m.).)  In addition, Plaintiff filed two charges of discrimination against Defendant with the Michigan Department of Civil Rights.  (Pl.'s Ex. 11, November 2001 Charge of Discrimination; Pl.'s Ex. 15, April 2003 Charge of

Discrimination.) The first was dropped when the issue was internally resolved, and the second was dismissed for insufficient evidence. (Pl.'s Resp. at 10; Pl.'s Ex. 20, Notice of Disposition and Order of Dismissal.)

## II. STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and summary judgment is to be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Mt. Lebanon Per. Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). It is not necessary for the moving party to support its motion with affidavits or other similar forms of evidence; rather, the movant need only demonstrate that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Failure on behalf of the non-movant to present sufficient evidence on an essential element of a claim renders all other facts immaterial for purposes of summary judgment. *Elvis Presley Enters. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 250. Therefore, the court must examine the evidence provided in a light that is most

6

favorable to the non-moving party and decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Anderson*, 477 U.S. at 251-52.

### III.  DISCUSSION

**A. COUNTS I, II, IV AND V – SEX AND RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, AND THE ELLIOTT-LARSEN CIVIL RIGHTS ACT ("ELCRA"), M.C.L. § 37.2101, ET SEQ.**

Where the plaintiff fails to present direct evidence of racial or sex discrimination, courts analyze Title VII and ELCRA cases under the *McDonnell Douglas* burden-shifting paradigm. *Hatchett v. Health Care and Retirement Corp. of America*, 2006 WL 1525688, *3 (6th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Under this approach, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  In order to establish her *prima facie* case, Plaintiff must prove that (1) she is a member of a protected class (in this case, an African-American); (2) she suffered an adverse job action, (3) she was qualified for the position, and (4) that similarly-situated persons not in the protected class were treated differently, not being subjected to the same adverse action.  *See Lytle v. Malady*, 458 Mich. 153 (1998); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1166 (6th Cir. 1996).  If Plaintiff satisfies this burden, then Defendant must rebut the inference of discrimination created by the *prima facie* case by articulating a legitimate, nondiscriminatory reason for its employment action.  *McDonnell Douglas*, 411 U.S. at 802.  Finally, Plaintiff's claim can still succeed if she can prove by a preponderance of the evidence that the Defendant's proffered reason is merely a pretext for discrimination.  *Id.* at 804-05.

### 1. Prima Facie Case of Discrimination

### A. Termination

According to Plaintiff, her first claim of discrimination "emanated from the fact that she was terminated from employment because she engaged in an altercation with a Caucasian male co-worker who not only retained his job but received no punishment . . . for engaging in the altercation with Plaintiff." (Pl.'s Resp. at 18.)

In its motion, Defendant addresses both the incident with Mr. Fritz and Ms. Lampros, arguing that "Plaintiff has failed to establish that she was treated differently than similarly situated individuals outside of the protected class" as the incident involving Ms. Lampros "did not have any witnesses which corroborated one side of the story or the other" and "[i]n the matter involving Jon Fritz, employee Marion Rapp provided a statement which buttressed Mr. Fritz's version of the events." (Def.'s Mot. at 6-7.) Defendant further contends that Plaintiff "was treated in the same manner as Ms. Lampros with respect to the incident in July of 2000. Therefore, individuals within and without the class were treated similarly with respect to that incident." (*Id.* at 7.) Third, Defendant argues that "Mr. Fritz [i]s in no way a similarly situated individual with respect to the events that transpired on November 12, 2003." (*Id.*) Finally, Defendant argues that "Defendant has established that numerous individuals outside of the protected classes or race and sex were previously terminated for engaging in verbal altercations such as the conduct Plaintiff exhibited on November 12, 2003." (*Id.*) (citing Lange Dep. at 110-11; Kulish Dep. at 53-54.)

In response, Plaintiff maintains that she "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to

8

be considered similarly situated; rather the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." (Pl.'s Resp. at 18.)  Plaintiff further argues that "Defendant's assertions that Plaintiff's participation in the altercation [with Fritz] constituted insubordination are pretextual insofar as Fritz was not her manager or superior and is noted in their own documentation a 'fellow employee.'" (*Id.* (citing Kulish Dep. 45; Pl.'s Ex. 24, November 12, 2003 Record of Occurrence).)  Because the details of their altercation are disputed, they will be construed in a light most favorable to non-movant Plaintiff.

In a Title VII disparate treatment case, "[s]imilarly situated means the same or substantially similar background, education, experience, job responsibilities, and performance.  Similarly situated means job responsibilities that require the same skill and ability and/or job responsibilities that are equal and interchangeable." *McMillan v. Castro*, 405 F.3d 405, 413 (6th Cir. 2005).  Although the plaintiff need not demonstrate an exact correlation on every single aspect of employment, "the plaintiff must prove that all of the *relevant aspects* of h[er] employment are 'nearly identical' to those of the… employees who [s]he alleges were treated more favorably.  The similarity between the compared employees must exist in all *relevant aspects* of their respective employment circumstances." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1998) (citing *Ruth v. Children's Medical Center*, 940 F.2d 662 (Table), 1991 WL 151158, at *6 (6th Cir. Aug. 8, 1991)) (emphasis added).  Plaintiff and Fritz are not similarly situated individuals.

Plaintiff argues – much too broadly – that, simply because she and Fritz were both employees of MTS at the time of their altercation, they are "similarly situated."

9

(Pl.'s Resp. at 18.)  The proper inquiry, however, is far more narrowly focused to determine whether the relevant aspects of employment are "nearly identical." *Pierce,* 40 F.3d 802.

At the time of the altercation, Fritz held the position of Shipping Manager, a supervisory role, while Plaintiff held a non-supervisory role.  (Sherman Dep. at 48.) Plaintiff claims that this distinction is not a *relevant* aspect for consideration because Fritz was not *her* manager or direct superior.  According to common experience and Defendant's company policy, however, supervisory positions are distinct from subordinate positions because they entail different expectations, skills, responsibilities, and employment duties.  (Kulish Dep. at 46.)  In addition, it is clear from the narrative leading up to the critical altercation in this case, that Fritz, as Shipping Manager, was responsible for approving certain changes before Plaintiff's supervisor could take further action.  (Pl.'s Dep. at 51-52.). In this sense, then, Fritz was in a superior, i.e., quasi-supervisory, position over Plaintiff's supervisor.

Plaintiff admits that management or supervisory positions are different from non-supervisory roles.  (*See* Pl.'s Resp. at 17-18; Pl.'s Ex. 12, Letter from Ebony Sherman to Bart Kulish (December 9, 2002).)  Indeed, she bases some of her discrimination claims before this court upon this distinction, e.g., complaining to Defendant on various occasions that she had not been promoted to a supervisory or management position. (Pl.'s Ex. 12, Letter from Ebony Sherman to Bart Kulish (December 9, 2002).)

In addition, Plaintiff's termination is attributed in substantial part to insubordination.  By definition, insubordination is "an act of disobedience to proper authority."  Blacks Law Dictionary (8th Ed. 2004).  As a manager within the company,

Fritz held a position of authority relative to Plaintiff's non-supervisory position. (Kulish Dep. at 45.) The charge of insubordination focuses entirely on the difference in employment status between these two individuals. Therefore, Fritz's managerial status within the company is a crucial distinction. (Pl.'s Ex. 26, Letter from Laura Lange, Employee Services Supervisor, MTS, to Ebony Sherman (December 10, 2003); Lange Dep. at 95-96.)

Fritz's supervisory role is a fundamental aspect of his employment and makes him a dissimilarly situated individual. *See Pierce*, 40 F.3d at 802 (observing that a member of management in a supervisory position is not similarly situated to an office administrator). Therefore, any possible difference in treatment by Defendant in dealing with the incident between Plaintiff and Fritz cannot satisfy Plaintiff's *prima facie* claim. The court, therefore, will grant Defendant's motion as to Plaintiff's discrimination claims based on her termination.

Even assuming *arguendo* that Plaintiff had presented evidence to establish her *prima facie* case of discrimination, Defendant would still be entitled to summary judgment because it offered a legitimate, nondiscriminatory reason for its employment action – Plaintiff engaging in a verbal altercation with Jon Fritz. (Def.'s Mot. at 6.) Defendant provides evidence of previous warnings proffered to Plaintiff regarding the use of abusive language in the workplace and her behavior towards fellow employees. (*See* Def.'s Ex. 5, Record of a Report on Inappropriate Conduct; Sherman Dep. at 38-39; Def.'s Ex. 19, Record of Occurrence by Thayer.)

Plaintiff does not contest that she did use vulgarities in her confrontation with Fritz, and admits to receiving warnings in the past. (Sherman Dep. at 40, 44-45, 55.)

Defendant's company policy clearly states that "verbal altercations with other employees is prohibited at all times on Company premises" and that an employee is "subject to discharge" on first notice. (Def.'s Ex. 15, Employee Handbook 43 (August 2002).) Even absent prior warnings, Defendant was justified in terminating Plaintiff for breaching this policy. Plaintiff knew of Fritz's management position, and should have been aware that hanging up the phone on him and using vulgarities such as "fuck" in her confrontation with him, regardless of any justification she might subjectively perceive, constituted insubordination, a proper ground for termination. A reasonable jury could conclude only that both grounds upon which the Defendant terminated Plaintiff's employment, as provided in the Employee Handbook, are legitimate and nondiscriminatory.

Plaintiff has failed to present evidence that Defendant's proffered reason for termination is merely a pretext for discrimination. On the contrary, the record reflects that Plaintiff's employment was terminated because of her willful (and apparently rather frequent) failure to comply with Defendant's company policy as stated in the Employee Handbook. (Def.'s Ex. 22, Letter from Laura Lange, Employee Services Supervisor, MTS, to Ebony Sherman (February 3, 2003); Def.'s Ex. 15, Employee Handbook 43 (August 2002).)

The Sixth Circuit has specifically held that more evidence is necessary to show pretext: "[i]f the bare bones elements of a plaintiff's prima facie case were sufficient to make this showing… the entire 'burden shifting' analysis of *McDonnell Douglas* and its successors would be illusory." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Furthermore, "in order to make this type of rebuttal

12

showing, the plaintiff may not rely simply upon his prima facie evidence." *Id.* Therefore, Plaintiff's unsupported allegation of pretext is without merit.

### B.  Failure to Promote

In relation to her failure to promote claim, Plaintiff asserts that "Defendant awarded [the] promotion [to Customer Satisfaction Supervisor in 2002] to a white male who Plaintiff was required to train for the position." (Pl.'s Resp. at 18 (citing Pl.'s Dep. at 85-86, Exs. 9, 10).)

The record reflects that Defendant awarded the position to Leroy LePlante ("LePlante"), a Caucasian male. (*Id.*; Pl.'s Ex. 12, Letter from Ebony Sherman to Bart Kulish (December 9, 2002).) As Defendant's Vice President explained to Plaintiff, the relevant (and different) aspects of each candidate's employment and experience were "instrumental factors in the selection process." (Pl.'s Ex. 13, Letter from Bart Kulish to Ebony Sherman (December 16, 2002).) Plaintiff had been working for Defendant's company for only three and a half years and had no supervisory experience. (Pl.'s Ex. 12, Letter from Ebony Sherman to Bart Kulish, Vice President and General Manager, Michigan Tube Swager Fabrication, Inc. (December 9, 2002).) Dissimilarly, LePlante had "over ten (10) years of direct supervisory experience, as well as an aggregate of over twenty-one (21) years of experience with MTS in a variety of positions and departments, and an intimate knowledge of [the] product line." (Pl.'s Ex. 13, Letter from Bart Kulish to Ebony Sherman (December 16, 2002).) As the *McMillan* court noted, "[s]imilarly situated means the same or substantially similar background, education, [and] experience." *McMillan*, 405 F.3d at 413. The lack of similarity between the compared employees in these directly relevant aspects of their respective employment

13

means that Plaintiff and LeGrande were not even approximately similarly situated. LeGrande's promotion therefore does not further Plaintiff's establishment of a *prima facie* case of discrimination.

Plaintiff failed to provide sufficient evidence to establish the fourth element of a *prima facie* case. Plaintiff has further failed to provide evidentiary support for the allegation that the legitimate non-discriminatory reason articulated by Defendant was a pretext for discrimination. Therefore, the court will grant summary judgment as to Plaintiff's claims for race and sex discrimination for failure to promote her.

**B. COUNTS III AND VI – RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, AND THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**

To establish retaliation under Title VII, Plaintiff must establish that: (1) he engaged in protected activity; (2) Defendants knew of his protected activity; (3) thereafter Defendants took an adverse employment action against him; and (4) there was a casual connection between the protected activity and the adverse action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). If and when a plaintiff has established a prima facie case, the burden of production of evidence shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792-93 (6th Cir. 2000) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). Once the defendant has successfully fulfilled this obligation, the plaintiff must demonstrate "that the proffered reason was not the true reason for the employment decision." *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

14

The parties do not debate whether Plaintiff engaged in protected activity, whether Defendant knew about the activity, or whether Defendant took action that was adverse to Plaintiff, but they do dispute the issue of causation and whether Plaintiff can prove that Defendant's reasons for terminating Plaintiff were pretextual for retaliation.

The plaintiff's burden of establishing a prima facie case of retaliation is "not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Moon v. Transport Drivers Inc.*, 836 F.2d 226, 230 (6th Cir. 1987). No one factor is dispositive in the causal connection analysis, and evidence that the defendant treated plaintiff differently from a comparable employee or that the adverse action was taken shortly after the plaintiff engaged in the protected activity is relevant. *Id.*

In its motion, Defendant argues that "Plaintiff has clearly not set forth evidence establishing a causal link between [P]laintiff's protected activity and the termination of her employment. Plaintiff's termination occurred seven months after she filed her second discrimination charge. Thus, there is no temporal proximity to the protected activity." (Def.'s Mot. at 16.)

In response, Plaintiff asserts that "in early 2004, Defendant . . . began papering Plaintiff's personnel file with documentation to suggest that Plaintiff did not get along well with her co-workers. Notably, however, and contrary to termination documents, Defendant did not counsel Plaintiff regarding interpersonal skills." (Pl.'s Resp. at 22.) Plaintiff maintains that "Defendant, weary of her many complaints and charges of discrimination, was looking for a reason to nail her, and used the altercation with Jon Fritz as the hammer." (*Id.*) In support of her argument, Plaintiff presents the following timeline:

15

    1.  August 14, 2000: Plaintiff writes letter to Bart Kulish complaining of race discrimination and hostile work environment
    2.  November 11, 2001: Plaintiff files first charge of discrimination with the Michigan Department of Civil Rights complaining of race and gender discrimination
    3.  December 9, 2002: Plaintiff writes another letter to Bart Kulish complaining of race and gender discrimination and hostile work environment
    4.  January 21, 2003: Plaintiff transmits e-mail to Bart Kulish asking for meeting to discuss issue that is causing her mental anguish
    5.  April 17, 2003: Plaintiff files second charge of discrimination with the Michigan Department of Civil Rights complaining of race and gender discrimination
    6.  May 29, 2003: Plaintiff transmits email to Cynthia Hensley and Bart Kulish complaining about race and gender discrimination
    7.  October 3, 2003: Michigan Department of Civil Rights transmits its Notice of Determination relative to Plaintiff's second charge of discrimination
    8.  November 13, 2003: Plaintiff is terminated.

(Pl.'s Resp. at 25.)  Plaintiff's first claim of discrimination was filed with the Michigan Department of Civil Rights in November 2001 and the second one was filed in April 2003, with Plaintiff's complaints to management in between.  (Def.'s Exs. 16 and 17.)  However, Plaintiff's personnel file contains multiple warnings and complaints filed, not simply by Defendant or its managers, but also by Defendant's fellow employees.

    Plaintiff merely presents an argument in which she characterizes Defendant as "papering" her file, i.e., Defendant keeping track of disciplinary occurrences, but has not presented actual evidence that supports the conclusion of a causal connection between her protected activity and her termination.  She does not present any evidence, for example, that Defendant "papered" her file with falsehoods, or incidents of insufficient significance. The court will grant Defendant's motion as to these claims.

    Because the language of the ELCRA "strongly parallels" the language of Title VII, "Michigan courts have generally looked to federal precedent for guidance in interpreting

the ELCRA." *Hartleip v. McNeilab*, Inc. 83 F.3d 767, 775 (6th Cir.1996) (citing *Radtke v. Everett*, 442 Mich. 368, 381-82, 501 N.W.2d 155, 162 (1993). *See also Jenkins v. Southeastern Michigan Chapter, American Red Cross*, 141 Mich.App. 785, 793, 369 N.W.2d 223, 227 (1985) (noting that it is appropriate to rely on federal precedent in deciding discrimination cases under ELCRA). The only significant difference between the Title VII and ELCRA standards is that under ELCRA the plaintiff must show that filing his charge of discrimination was a "significant factor" in the adverse employment decision, which requires more than the causal link required under Title VII. *Moore v. KUKA Welding Sys. & Robert Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). Because Plaintiff has failed to produce sufficient evidence to support her Title VII claims, the Court concludes that she has also failed to produce sufficient evidence to support her ELCRA claims.

**C.  COUNT VII – RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

A prima facie case showing of a § 1981 violation may be established by tracking the order and allocation of proof for Title VII disparate treatment. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001) ("This circuit has held that to prevail in a claim of race discrimination under § 1981 relying on circumstantial evidence, a plaintiff must meet the burden-shifting standard of proof for Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).") (citations omitted). The court, applying its analysis from its discussion of Plaintiff's Title VII claim, grants Defendant's motion as to this claim as well.

17

## IV.  CONCLUSION

IT IS ORDERED that Defendant's motion for summary judgment [Dkt. # 13] is GRANTED.


          S/Robert H. Cleland
          ROBERT H. CLELAND
          UNITED STATES DISTRICT JUDGE

Dated:  July 21, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 21, 2006, by electronic and/or ordinary mail.


          S/Lisa Wagner
          Case Manager and Deputy Clerk
          (313) 234-5522